

**FILED**

NOV – 2 2015

CLERK, U.S. DISTRICT COURT
WESTERN DISTRICT OF TEXAS
BY_____
DEPUTY

# UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF TEXAS
## SAN ANTONIO DIVISION

| | | |
|---|---|---|
| SEALED, | § | Civil Action No. |
| Plaintiffs, | § § § § § § § | **SA15CA0957 XR** |
| | § | **FILED *IN CAMERA* AND UNDER SEAL** |
| v. | § § | |
| SEALED, | § § § | Pursuant to 31 USC §3730(b)(2) |
| Defendants. | § | **Jury Trial Demanded** |

## ATTENTION SEAL CLERK

## FILED IN CAMERA AND UNDER SEAL

## ORIGINAL FALSE CLAIMS ACT COMPLAINT

# UNITED STATES DISTRICT COURT
## FOR THE WESTERN DIVISION
## SAN ANTONIO DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, THE STATE OF CALIFORNIA, THE STATE OF COLORADO, THE STATE OF FLORIDA, THE STATE OF LOUISIANA, THE STATE OF MONTANA, THE STATE OF NEVADA, THE STATE OF NEW MEXICO, THE STATE OF WASHINGTON, *ex rel.* ERICA ZELICKOWSKI, | CIVIL ACTION NO. _____ |
| Plaintiffs, | **FILED *IN CAMERA* AND UNDER SEAL** |
| vs. | **PURSUANT TO THE FEDERAL FALSE CLAIMS ACT, 31 U.S.C. §§3730(b)(2)** |
| ALBERTSONS LLC, | |
| Defendants. | **JURY TRIAL DEMANDED** |

## ORIGINAL FALSE CLAIMS ACT COMPLAINT

# INDEX

|  |  | **Page** |
|---|---|---|
| I. | Introduction............................................................................... | 3 |
| II. | Jurisdiction and Venue............................................................... | 4 |
| III. | Parties...................................................................................... | 5 |
| IV. | Medicaid Usual & Customary Law ………………………………….…... | 6 |
| V. | Medicare Part D Usual & Customary Law …………………………….. | 14 |
| VI. | Tricare and other Federal Payer Programs ……………………………. | 23 |
| VII. | Drug Discount Programs and Albertsons's Fraudulent Actions ………… | 24 |
| VIII. | Relator's Knowledge of the Fraud         ………………………………… | 29 |
| IX. | Particularity of Defendant's Illegal Overbilling …………………………. | 30 |
| | Count I | Violations of the Federal False Claims Act ………………<br>Medicaid, Tricare and Other Federal Programs | 32 |
| | Count II | Violations of the Federal False Claims Act……………….<br>Medicare Part D Program | 33 |
| | Count III | California False Claims Act…………………………………… | 36 |
| | Count IV | Colorado Medical False Claims Act…………………..…… | 37 |
| | Count V | Florida False Claims Act……………………………………. | 38 |
| | Count VI | Louisiana Medical Assistance Programs Integrity Law….. | 38 |
| | Count VII | Montana False Claims Act…………………………………. | 39 |
| | Count VIII | Nevada False Claims Act…………………………………… | 40 |
| | Count IX | New Mexico……………………………………………….... | 41 |
| | Count X | Washington State Medicaid Fraud False Claims Act ……. | 41 |
| X. | Prayer for Relief…………………………………………………………. | 42 |
| XI. | Jury Demand……………………………………………………………... | 42 |

## I.     INTRODUCTION

1.     This is a False Claims Act case brought under the Federal False Claims Act, 31 U.S.C. §3729, et.seq., and the false claims acts of the plaintiff states. It is brought by plaintiff and relator Erica Zelickowski, through her undersigned attorneys, on behalf of the United States of America (or the federal government), the states of California, Colorado, Florida, Louisiana, Montana, New Mexico, Nevada and Washington (collectively "the states.")

2.     This case involves illegal overbilling by Defendant Albertsons LLC ("hereinafter referred to as "Albertsons") to the federal government and states in the Medicaid program, and to the federal government in the Medicare Part D, Tricare, CHAMPVA, Federal Employees Health Benefit Program (FEHBP), United States Military Healthcare Facilities, the Indian Health Service Facilities and to public health clinics programs. Beginning sometime prior to 2013, Albertsons began a successful marketing campaign to lure customers, offering them deep discounts for a large variety of generic drugs through a "club" program.  These inexpensive, discounted prices established the "Usual and Customary" prices for these generic prescription drugs. Federal health care laws for these programs and the laws of the plaintiff state governments mandated that the governments were not to be charged more than the "Usual and Customary" prices for these drugs. The laws and contracts of the Medicare Part D and MA-PD drug programs also legally mandated that Albertsons provide its lower club prices for generic drugs. Despite these laws and contracts, Albertsons knowingly charged the plaintiff governments substantially more for these generic drugs in the government funded programs, thereby wrongfully overcharging the plaintiff governments in violation of the false claims acts.

3

## II.    JURISDICTION AND VENUE

3.    This is a civil action arising under the laws of the United States to redress violations of the False Claims Act, 31 U.S.C. §§3729 et seq. This court has jurisdiction over the subject matter of this action: (i) pursuant to 31 U.S.C. §3732, which specifically confers jurisdiction on this Court for actions brought pursuant to 31 U.S.C. §§3729 and 3730; (ii) pursuant to 28 U.S.C. §1331, which confers federal subject matter jurisdiction; and (iii) pursuant to U.S.C. §1345, because the United States is a plaintiff.

4.    This suit is not based upon prior public disclosures of allegations or transactions in a criminal, civil, or administrative hearing, lawsuit or investigation or in a Government Accounting Office or Auditor General's report, hearing, audit or investigation, or from the news media.

5.    To the extent that there has been a public disclosure unknown to relator, relator is an original source under 31 U.S.C. §3730(e)(4), and the other government false claims statutes.  She has direct and independent knowledge of the information on which the allegations are based and has voluntarily provided the information to the government before filing this *qui tam* action.

6.    Relator is concurrently providing to the Attorney General of the United States, to the United States Attorney for the Western District of Texas, and to the appropriate attorney for the other government plaintiffs, a statement summarizing known material evidence and information related to this Complaint, in accordance with the provisions of 31 U.S.C. §3730(b)(2) and the similar provisions of the other government false claims acts.

7.    This court has jurisdiction over Albertsons under 31 U.S.C. §3732(a) because Albertsons can be found in, is authorized to transact business in, and is now

transacting business in the Western District of Texas. In addition, acts proscribed by 31 U.S.C. §3729 have occurred in this District.

8.     Venue is proper in the Western District of Texas under 31 U.S.C. §3732(a) and 28 U.S.C. §1391, because Albertsons conducts business in this District and, upon information and belief, the acts giving rise to this action occurred within the District.

9.     This Court has supplemental jurisdiction over the false claims act claims of the other plaintiff governments pursuant to 28 U.S.C. §1367. This federal court jurisdiction over state law false claims is further authorized by 31 U.S.C. §3732(b).

### III.     **PARTIES**

10.     Defendant Albertsons LLC is a nationwide retail grocery and pharmacy corporation headquartered at 250 Parkcenter Blvd, Boise, Idaho 83706. Albertsons LLC and New Albertsons (collectively "Albertsons") is owned by AB Acquisition LLC ("AB") and is controlled by a Cerberus Capital Management, L.P. ("Cerberus) led investor group, which also includes Kimco Realty Corporation (NYSE:KIM), Klaff Realty LP, Lubert-Adler Partners LP, and Schottenstein Stores Corporation. Cerberus is an American private equity firm, headquartered at 875 Third Avenue, New York City, New York.  Albertsons has been in the retail grocery business since 1939 and has gone through multiple sales and acquisitions and was sold to AB on January 10, 2013.  On January 30, 2015 AB purchased Safeway Inc. and merged it with Albertsons resulting in Albertsons owning and operating approximately 2,400 locations.   On its website, Albertsons boasts 2014 annual sales of $23 billion (prior to the Safeway acquisition). Albertsons has at least 2,000 retail pharmacy stores in 16 different states.  Albertsons is estimated to be the 5th largest pharmacy chain in the United States.

11.     Relator Erica Zelickowski graduated from the University of Southern Nevada Pharmacy School in 2009 with a Doctorate of Pharmacy.  Relator is a licensed pharmacist, having been originally licensed in Nevada in August 2009.  Prior to her employment with Albertsons, relator worked at Walgreens Co. as an intern pharmacist and pharmacist and as a Pharmacy Manager for Walmart. Relator began her employment with Albertsons on January 7, 2013 (when it was still SuperValu). Currently relator is not working for Albertsons.

## IV.     MEDICAID USUAL & CUSTOMARY LAW

12.     When reimbursing for drugs, the federal-state Medicaid program mandates that the Medicaid program shall pay the lower of (1) the estimated acquisition cost (EAC) of covered drugs, plus a reasonable dispensing fee, or (2) a provider's usual and customary (U&C) charges to the general public. 42 C.F.R. §512(b). (Emphasis added).

13.     While the specific reimbursement formulas vary from state to state, the state Medicaid programs reimburse pharmacy providers for each drug based on the lowest of (a) the EAC (estimated acquisition cost) as set by the states, (b) the Maximum Allowable Cost (MAC) set by the State Medicaid agency or (c) the provider's usual and customary charge. For generics (a/k/a "multiple source drugs") subject to a Federal Upper Limit (FUL), state Medicaid agencies must not pay more than those limits. Id. at 512(a).

14.     Albertsons, as a retail pharmacy selling drugs to Medicaid customers, has entered into Medicaid provider agreements with state Medicaid agencies in which it has agreed to comply with all Medicaid state and federal laws. Entering into these agreements and obeying them are conditions to payment of claims for drugs.  Attached

are samples of such provider agreements for the states of Idaho, Texas and California. See Exhibits 1, 2 and 3 respectively.

15.    Submission of claims by pharmacy providers such as Albertsons to the Medicaid agencies are made electronically, in real time.  Protocols for this transmission have been created by an ad hoc standards organization called the National Council for Prescription Drug Programs, Inc. (NCPDP).  Each claim is a separate transaction. The NCPDP standard specifies the information that must be transmitted and in which fields the data must be entered.  This is accomplished by the computer software in the pharmacy as the information is entered or calculated.  When the claim is so submitted, the Medicaid agency receives the claim, and in a few seconds either accepts or rejects it.  If the claim is accepted, the Medicaid agency transmits a message back to the pharmacy that acknowledges the acceptance of the claim, assigns it a unique reference number and processes it for payment in the next cycle – usually in a few weeks. These protocols have been in place for decades, and are occasionally updated. The pharmacy's Usual and Customary price is a mandated datum. It is entered into the computer system in the pharmacy, is included in the claim submission, and is considered by the Medicaid agency's computer system in calculating the proper reimbursement.

**State Medicaid Reimbursement Methodologies**

16.    Federal Medicaid rules and the pertinent state Medicaid rules mandate that a provider be reimbursed the usual and customary (U&C) charge. For example, in Idaho (the headquarters state for Albertsons) the Idaho Department of Medicaid mandates that pharmacies must bill their usual and customary charges, defined as the lowest charge by the provider to the general public for the same service, including

7

advertised specials. Idaho Medicaid's billing restrictions are clearly stated in Idaho Administrative Code 16.03.09. 665:

> **Prescription Drugs: Provider Reimbursement**
>
> Prescriptions not filled in accordance with the provisions of Subsection 664.02 of these rules will be subject to nonpayment or recoupment.
>
> **Billed Charges.**
>
> *A pharmacy's billed charges are not to exceed the usual and customary charges defined as the lowest charge by the provider to the general public for the same service including advertised specials.* Id. at 03. (Emphasis added).

Most other states have similar requirements in their Medicaid regulations, so as to be in compliance with 42 C.F.R. §447.512(b).

17.    In Texas, Texas Administrative Code section 355.8541(a) (1) mandates that Medicaid in Texas (administered by the Texas Health and Human Services Commission [HHSC]), will reimburse pharmacies for the **lesser** of (1) HHSC'S best estimate of acquisition costs (EAC) plus HHSC's currently established dispensing fee for prescriptions, (2) the usual and customary price charged the general public, or (3) gross amount due, if provided.

18.    The Texas Medicaid program defines usual and customary prices as follows:

> Rule §355.8544 Usual and Customary Prices
>
> (a) The usual and customary price is the price the provider most frequently charges the general public for the same drug. If the department cannot determine a most frequent price, the median price is used. Items that the provider must consider when determining the usual and customary price include the following:
>
> > (1) The term general public does not include any person whose prescriptions are paid by third-party payers, including health insurers, governmental entities, and the Texas Medical Assistance (Medicaid) program.

(2) When a discount is given (including, but not limited to, cash rebate, monetary price discount, coupon of value) or advertised for any segment of the general public, the discount must be included in the usual and customary price determination for Medicaid prescriptions of the Medicaid recipient would otherwise have qualified as a member of that same segment of the general public. Some providers give discounts to non-Medicaid customers based on requirements similar to those specified in subparagraphs (A) and (B) of this paragraph. Providers must not use the following types of requirements as reason to disqualify Medicaid recipients as members of the same segment of the general public receiving the discount:

(A) possessing or presenting a special identification card or document, or making a verbal request for a discount;

(B) paying for the prescription by a particular method.

(b) If a provider utilized one pricing policy for cash recipient and a different pricing policy for charge recipient, the lower of the two pricing policies is the provider's usual and customary price.

19. Attached as Exhibit 4 is a May 16, 2008 letter of the Texas Health and Human Services Commission where it expressly warned CVS (another national pharmacy chain) that it should be giving Medicaid the benefit of their cash discount program, which was patterned after the program of competitor Walmart. Clearly Medicaid expects the discounted prices provided in cash discount programs.

20. Every state's Medicaid drug reimbursement methodology provides for reimbursement of the ingredient cost of the drug and, in certain circumstances, a dispensing fee.

21. The following list describes the methodology for reimbursing the ingredient cost and dispensing fee in those states that include "usual and customary" charges as part of their reimbursement methodology. The dispensing fee is typically in the range of three to five dollars per transaction. For ease of reference the state Medicaid reimbursement formulas for the states in which Albertsons does Medicaid business

(except for Arizona) are listed in addition to Idaho and Texas above. These are the abbreviations used in this section:

Average Wholesale Price: AWP

Federal Upper Limit (as defined by CMS): FUL

Maximum Allowable Cost (as defined by the State): MAC

Estimated Acquisition Cost (as defined by the State): EAC

Wholesale Acquisition Cost: WAC

### Arkansas

Reimbursement for covered multiple source drugs shall not exceed the lowest of:

1. FUL or MAC, plus a dispensing fee;

2. Provider's usual and customary charge; or

3. EAC plus a dispensing fee

Ark. Code R. Pharmacy § 251.000.

### California

Pharmacy providers are required to submit their usual and customary charge when billing Medi-Cal for prescription drugs. Usual and Customary means the lower of the following:

1. The lowest price reimbursed to the pharmacy by other third party payors in California other than Medi-Cal managed care plans and Medicare Part D prescription drug plans; or

2. The lowest price routinely offered to any segment of the general public.

Welfare and Institutions Code (W&I Code) 14105.455

**Colorado**

Reimbursement for a prescription drug is made at the lesser of the provider's usual and customary charge or the allowed ingredient cost plus a dispensing fee.

 10 CCCR. 2505-10 8.800

**Florida**

Medicaid reimbursement for prescribed drugs is the lowest of:

1. EAC (defined as the lesser of AWP minus 16.4% or WAC plus 4.75%) plus a dispensing fee;

2. FUL plus a dispensing fee;

3. MAC plus a dispensing fee; or

4. The amount billed by the pharmacy which cannot exceed the pharmacy's usual and customary charge for the prescription (inclusive of any dispensing fee).

Fla. Admin. Code 59G-4.251(1).

 **Louisiana**

Reimbursement for covered drugs is the lowest of:

1. EAC plus a dispensing fee;

2. FUL plus a dispensing fee;

3. MAC plus a dispensing fee; or

4. The usual and customary price.

Louisiana Medicaid Program Provider Manual, Chapter 37, section 37.6.1.

**Montana**

Pharmaceuticals are reimbursed at the lesser of the following:

1. EAC plus a dispensing fee;

2. FUL plus a dispensing fee;

11

3. MAC plus a dispensing fee; or

4.  The usual and customary charge.

Mont. Admin. R. 37.86.1105(1).

**Nevada**

Legend drugs are reimbursed at the lowest of:

1.  Wholesale Acquisition Cost (WAC) plus 2% plus dispensing fee;

 2. FUL plus dispensing fee;

3. MAC plus dispensing fee;

4.  The pharmacy's usual and customary charge.

Nevada Medicaid Pharmacy Manual, Section 5.2.

**New Mexico**

Reimbursement is made at the lesser of the following:

1.  Provider's billed charge must be its usual and customary charge for services.

2.  MAC plus a dispensing fee;

3.  FUL plus a dispensing fee; or

4.  EAC plus a dispensing fee.

N.M. Code R. § 8.324.4.16.

**Oregon**

Reimbursement for generic drugs is made at the lesser of the following:

1.  Provider's usual and customary charge; or

2.   EAC, minus applicable copayments, plus dispensing fee.

Or. Admin. R. 410-121-0155(3).

**Utah**

Pharmacy reimbursement is the lesser of:

1.   If there is a MAC then the lesser of it or the usual and customary charge to the general public;

2. Otherwise, reimbursement is the lesser of the Ingredient Cost Submitted, FUL, EAC or the usual and customary charge to the general public.

Utah Medical Assistance Program State Plan, attachment 4.19-B, section S.

**Washington**

Pharmaceuticals are reimbursed at the lesser of the following:

1.  EAC plus a dispensing fee;

2.  Actual Acquisition Cost for §340(b) drugs plus a dispensing fee;

3.  Automated maximum allowable cost plus a dispensing fee;

4.  The usual and customary charge to the non-Medicaid population;

5.  State MAC plus a dispensing fee; or

6.  FUL plus a dispensing fee.

Wash. Admin. Code § 182-530-7000.

**Wyoming**

Reimbursement for multiple source drugs is the lower of:

1.  Cost of the drug plus a dispensing fee; or

2.  The usual and customary charge.

048-130-010 Wyo. Code R., CH. 10§ 16.

22.    Medicaid's general coverage parameters exclude items that are not "provided economically and only when, and to the extent, medically necessary," 42 U.S.C. § 1320c-5(a) (1). Albertsons does not obey the clear direction of the federal law when it charges the government more than it charges the general public.  The Medicaid programs are not receiving an economically priced service; rather, the general cash paying public is receiving the economically priced service.

13

## V.   MEDICARE PART D USUAL & CUSTOMARY LAW

23.     Medicare is a federally-funded health care insurance program created in 1965 by Title XVIII of the Social Security Act, and provides insurance coverage for people over the age of 65 and people with disabilities.  It is administered by the Centers for Medicare and Medicaid Services ("CMS"), which is a division of the United States Department of Health and Human Services ("HHS").

24.     Medicare services are also to be provided "economically".  42 U.S.C. §1320c-5(a) (1).

25.     Medicare services are not to be "furnished substantially in excess of such individual's or entity's usual charges".  42 U.S.C. §1320a-7(b) (6).

26.     Medicare Part A pays for, *inter alia,* items and services provided to hospital inpatients, home health care patients, and for patients of Skilled Nursing Facilities ("SNFs"). A SNF provides skilled care to a patient after an injury or a hospital stay if the patient meets certain conditions, and may be part of a nursing home or hospital. 42 U.S.C. §§ 1395c, 1395d.

27.     Medicare Part B is a federal program that covers physician services and certain injectable, inhalation and infused drugs administered by the health care provider. 42 U.S.C. §§ 1395j, 1395k, 1395l.

28.     Medicare Part C, also known as Medicare Advantage ("MA"), allows Medicare Part A and B eligibles to pay premiums to a provider network and receive their covered services through that network. The government pays the provider a monthly capitated amount to provide Medicare Part A and Part B items and services to the enrolled beneficiaries.  42 U.S.C. 1395w-21 et seq.  For an additional premium, most plans also offer Medicare Part D outpatient drug coverage. Such plans are known as MA-PD plans.

In the case of an enrollee in an MA-PD plan, the MA organization also receives payment for coverage of Part D prescription drug benefits, including: direct and reinsurance subsidy payments for qualified prescription drug coverage, and reimbursement for the beneficiary drug premium, and the cost sharing reductions applicable to low-income individuals enrolled in the plan (Medicare Managed Care Manual: Chapter 8, Section 10) Whether ultimately paid by the government directly or on a capitated basis, the government imposes certain reporting requirements. Where the PDE data is submitted at higher than usual and customary the cost to the government is increased over time.

29.    Medicare Part D ("Part D") began January 1, 2006 and pays for prescription drug benefits for the elderly and disabled. 42 U.S.C. §1395w-101 et seq. Part D requires beneficiaries to enroll and pay certain premiums, deductibles, co-payments, and in some cases 100% of drug costs after a certain dollar threshold up to a maximum dollar amount (the "donut hole"), that then triggers catastrophic coverage. The federal government pays 75% of actual costs between the deductible and the donut hole, and 95% of catastrophic coverage. For low-income individuals there are various tiers in which the government pays greater percentages, up to a 100% subsidy which may be capitated.

30.    Medicare Part D adopted Medicaid's definition of "covered outpatient drugs." 42 U.S.C. §1395W-102(e) and 42 C.F.R. 423.100, *incorporating by reference* 42 U.S.C. §1396r-8(k) (2) (A) (i) (excluding coverage for drugs that are not FDA-approved under section 505 of the Federal Food, Drug, and Cosmetic Act [codified at 21 U.S.C. §355]).

31.    The government also requires the Part D Sponsor to ensure that network and mail order pharmacies provide the <u>lower of</u> the negotiated price or the <u>usual and</u>

customary price when a covered discount card drug for a negotiated price is available at the point of sale. 68 Fed. Reg. 69840, 69862 (Dec. 15, 2003). The Code of Federal Regulations and the Medicare Prescription Drug Benefit Manual (Chapter 5, § 10.2, Benefits and Beneficiary Protections, Rev. 9/30/11) define usual and customary price as "[t]he price that an out-of-network pharmacy or a physician's office charges a customer who does not have any form of prescription drug coverage for a covered Part D drug." 42 C.F.R. § 423.100.

32.     Unlike Medicaid, Medicare Part D is a quasi-free market model with a more complex system for determining the price paid for outpatient drugs, and a more complex system for submitting claims.  Ultimately, however, it is still a per-item payment system, and the federal government still pays for each drug purchased under the program.

33.     An individual is eligible to enroll in Part D if the individual lives in the service area of a Part D plan and is entitled to Medicare benefits. Part D benefits are provided by a Part D plan sponsor, which is either a prescription drug plan (PDP), a Medicare Advantage organization that offers a Medicare Advantage prescription drug plan (MA-PD plan), a PACE organization offering a PACE plan including qualified prescription drug coverage, or a cost plan offering qualified prescription drug coverage. 42 C.F.R. §423.4.

34.     A Part D plan sponsor must submit a bid in the year prior to the calendar year in which Part D benefits will actually be delivered. See 42 C.F.R §423.265. The bid contains a per member per month (PMPM) cost estimate for providing Part D benefits to an average Medicare beneficiary in a particular geographic area. From the sponsor's bids, Centers for Medicare & Medicaid Services (CMS) calculates

nationwide and regional benchmarks which represent the average PMPM cost. If the plan sponsor's bid exceeds the benchmark, the enrolled beneficiary must pay the difference as part of the monthly beneficiary premium.

35.     CMS provides each Part D sponsor with a direct subsidy in the form of advance monthly payments equal to the Part D plan's standardized bid, risk adjusted for health status, minus the monthly beneficiary premium, estimated reinsurance subsidies for catastrophic coverage, and estimated low-income subsidies. 42 C.F.R. §423.315, 423.329.

### The Prescription Drug Event Record (PDE) Constitutes a "Claim" For Payment as that Term is Used in the False Claims Act

36.     When a pharmacy, like Albertsons, dispenses drugs to a Medicare beneficiary, it submits a claim electronically to the beneficiary's Part D plan and receives reimbursement from the plan sponsor for the portion of the drug cost not paid by the beneficiary. The Part D plan sponsor ultimately notifies CMS that a drug has been purchased and dispensed by means of a document called a Prescription Drug Event record (PDE); including the amount it has paid to the pharmacy. Part D plan sponsors subcontract with many entities to provide drugs to the Medicare Part D beneficiaries enrolled in their plans. These include subcontracts with pharmacy benefit managers (PBMs) who provide drugs through mail order operations and pharmacy chains which provide drugs on a retail level. CMS uses the information in the PDE at the end of the payment year when it reconciles its advance payments to the sponsor with the actual costs that the plan sponsor has incurred throughout the year.

37.     The PDE is an electronically created document that includes 37 fields of information about a specific drug transaction. This PDE document includes, inter alia, the costs of the prescription, the payment date, the beneficiary I.D. number, the number of medications, the dispensing status, the identity number of the retail pharmacy or other provider like Albertsons, the National Drug Code (NDC) for the medication and the compound code if the dispensed drug was compounded or mixed.

38.     In the year following the benefit year, CMS reconciles a Part D plan sponsor's actual prescription drug costs as derived from its PDE records against the sponsor's bid. If a Part D plan sponsor's actual costs exceed the estimated costs, the plan sponsor may be able to recoup some of its losses through a risk sharing arrangement with CMS. Conversely, if a Part D sponsor's estimated costs exceed its actual costs by a specified amount, payments to the Part D plan sponsor for the year are reduced and the plan sponsor will have to pay back some of its estimated payments. **This risk sharing arrangement between CMS and PDP plan sponsors clearly puts the government as an intended beneficiary of discounted pricing. The government wrongfully pays more if discounted pricing is not provided to each Medicare Part D recipient.**

39.     As a condition for receiving its monthly payment from CMS, a Part D plan sponsor must certify the accuracy, completeness and truthfulness of all data related to payment. Data related to payment includes enrollment information, <u>claims data</u>, bid submission data and any other data specified by CMS. 42 C.F.R. §423.505(k)(1). The Part D plan sponsor also certifies its acknowledgement "that the claims data will be used for the purpose of obtaining Federal reimbursement." 42 C.F.R. §423.505(k)(3). If the claims data has been generated by a related entity,

contractor or subcontractor of a Part D plan sponsor, that entity, contractor or subcontractor must "similarly certify" that the claims data it has generated is accurate, complete and truthful and must acknowledge that the claims data will be used for the purposes of obtaining federal reimbursement. 42 C.F.R. §423.505(k)(3). Albertsons as a subcontractor has these obligations. The term "claims data" referred to in 42 C.F.R. §452.505(k)(3) includes PDE records. CMS recognizes that the submission of "inaccurate or incomplete prescription drug event (PDE) data" may constitute Medicare Part D fraud, waste, or abuse.  CMS Prescription Drug Benefit Manual, Chapter 9 - Part D Program to Control Fraud, Waste, and Abuse," 4/25/2006, page 56.

40.    Medicare Part D plan sponsors must also certify in their contracts with CMS that they agree to comply with all federal laws and regulations designed to prevent fraud, waste, and abuse. 42 C.F.R. §423.505(h)(1). CMS regulations require that all subcontracts between Medicare Part D plan sponsors and downstream entities, including pharmacies and PBMs, contain language obligating the pharmacy to comply with all applicable federal laws, regulations, and CMS instructions. 42 C.F.R. §423.505(i)(4)(iv). It is very clear that the government expects complete compliance with all laws and contract terms relating to Medicare Part D claims.

41.    Most of the Medicare Part D PDE data elements are the same elements developed by the NCPDP, which have been used for decades by PBMs, pharmacies, and other providers when submitting Medicare Part D and Medicaid claims for prescription drugs to CMS for payment.  In its "Instructions: Requirements for Submitting Prescription Drug Event Data," dated 4/27/2006, at page 13, CMS stated: "Most data elements represent existing NCPDP fields where we employ the same

definition and field values that are currently in use per the NCPDP version 5.1 drug claim standard. Medicare requires providers to submit prescription drug claims in compliance with the NCPDP version 5.1 which was approved in September of 1999.

42.     When CMS identified "Data Elements for PDE Records," it clearly stated, and all parties were on notice, that submission of PDE data is an express condition of payment:  "In this section, we list the required data elements that must be submitted on PDE records for payment….. This section defines each data element and its specific potential for use for CMS's payment process." Id. And see also, "As a condition of payment, all Part D plans must submit data and information necessary for CMS to carry out payment provisions (§1860D-15(c)(1)(c) and (d)(2) of the Act and 42 CFR § 423.322)". Id. at page 9.

43.     CMS provided that the reporting requirements apply to all Part D Plans. Id. Thus, CMS data reporting requirements and instructions apply to all Medicare Part D Plans (PDPs), Medicare Advantage Part Plans (MA-PDs), and any other entity providing Medicare Part D benefits.

44.     Sponsors and their subcontractors, when submitting Medicare Part D PDE data to CMS, must certify that all claims are true and accurate to the best of their knowledge and belief.  CMS Prescription Drug Benefit Manual, Chapter 9 - Part D Program to Control Fraud, Waste, and Abuse, Section 80.1, p. 67, citing 42 C.F.R. §423.505(k)(3).

45.     Thus, CMS's regulations for the submission of Medicare Part D PDE data place the legal risk of submitting invalid Medicare Part D claims data squarely with the submitting or generating entity:  "CMS requires that **any related entity, contractor or subcontractor that generates claims data** on behalf of a Sponsor must **certify to**

CMS the accuracy, completeness, and truthfulness of that data; and acknowledge that the data will be used for purposes of obtaining Federal reimbursement." <u>See</u> "Prescription Drug Benefit Manual, Chapter 9 - Part D Program to Control Fraud, Waste, and Abuse," page 16, Section 40.2; citing 42 C.F.R. §423.505(k) (3) (emphasis added).

46.    In keeping with the requirements of 42 C.F.R. §423.405(k)(3) and CMS Prescription Drug Benefit Manual, Chapter 9 - Part D Program to Control Fraud, Waste, and Abuse, Section 80.1, p. 67, Sponsors and their subcontractors who submit Medicare Part D PDE data to CMS must certify that it is true and accurate. Since January 2006, this express certification of Medicare Part D PDE data has been included in CMS's Electronic Data Interchange (EDI) Agreement (or a similar document). The EDI Agreement must be executed in order for an eligible organization to submit PDE data electronically to CMS.  The EDI is executed by Medicare Plans offering Part D prescription drug benefit and/or the Part D PBMs who submit PDE data on behalf of Part D Sponsors.  The certification on the Part D EDI Agreement contains the following (or similar) language:

> **"By signing below, the eligible organization certifies that each submission of PDE data pursuant to this Agreement will be accurate and complete to the eligible organization's best knowledge, information and belief."**

### <u>Medicare Part D Usual & Customary Pricing Restrictions</u>

47.    Like Medicaid, Medicare's general coverage parameters exclude items that are not "provided <u>economically</u> and only when, and to the extent, medically necessary," 42 U.S.C. § 1320c-5(a)(1).  Albertsons does not follow the clear direction of this statute, if as in this case they are charging the government more than they charge the general public.  Medicare is not receiving an economically priced service; rather, the

general cash paying public is receiving the economically priced service.

48.     Medicare Part D prescriptions claims are subject to the similar type of Usual & Customary (U&C) pricing laws and rules as are Medicaid prescriptions.  If a provider's usual price is lower than the Medicare contract price, the provider must provide that lower price to Medicare or risk being excluded as a provider.  42 U.S.C. 1320a-7(b)(6) provides that the Secretary may exclude entities from participation in any Federal health care program for submitting claims for excessive charges.  This section specifically provides that excessive charges are grounds for exclusion as follows:

> Any individual or entity that the Secretary determines-
>
> (A) has submitted or caused to be submitted bills or requests for payment (where such bills or requests are based on charges or cost) under subchapter XVIII of this chapter or a State health care program containing charges (or, in applicable cases, requests for payment of costs) for items or services furnished *substantially in excess of such individual's or entity's usual charges…. (emphasis added).*

49.     Medicare Part D prescriptions are also subject to U&C private contract pricing terms and conditions imposed by the PDP sponsors and the PBM companies that adjudicate and administer Medicare Part D Plans.  These private contract pricing terms accrue to the benefit of Medicare Part D by providing lower discounted U&C pricing to Medicare.  PBM companies have large networks of contracted pharmacies, both retail and mail-order, to provide claims service to private and Medicare Part D patients.

50.     Based on information and belief, and a sampling of PBM Medicare Part D contracts with retailers, these contracts and Albertsons contracts with PBM companies invariably require that a retail seller of prescriptions, like Albertsons, must price prescriptions at the PBM contracted rate or their U&C price, whichever is lower.  See Exhibits 5-7 for representative PBM contracts. If the pharmacy is willing to sell a

prescription at the lower U&C price to its usual cash customers, it must also give that same lower price to Medicare Part D recipients and ultimately the government that pays for them.  It is very clear that the government expects complete compliance with all laws and contract terms relating to Medicare Part D claims. Albertsons is one of the largest pharmacy corporations in America with vast resources to enforce compliance with Medicare Part D laws, rules and contract terms.

## VI.    TRICARE AND OTHER FEDERAL PAYER PROGRAMS

51.    TRICARE (formerly also called CHAMPUS), administered by the United States Department of Defense, is a healthcare program for individuals, dependants and retirees affiliated with the armed forces.  CHAMPVA, administered by the United States Department of Veterans Affairs, is a healthcare program for the families of veterans with 100% service-connected disability.

52.    The Federal Employee Health Benefit Program (FEHBP), administered by the United States Office of Personnel and Management, provides health insurance for federal employees, retirees, and survivors.

53.    The federal government pays for the cost of the generic prescription drugs at issue in this case, at United States Military Healthcare Facilities, the Indian Health Service Facilities and to public health clinics.

54.    The Tricare program is managed by Tricare Management Activity (TMA) under the Department of Defense. Tricare contracts with Express Scripts, Inc., a PBM, to administer Tricare's retail pharmacy benefits.

55.    The Federal Circuit Court of Appeals has described how a drug claim is processed between Tricare and Express Scripts:

The PBM is responsible for overseeing the distribution and payment for prescription drugs throughout the retail pharmacy network. When a TRICARE beneficiary purchases covered drugs at a network retail pharmacy, the pharmacy transmits data concerning the beneficiary to the PBM. The PBM then relays this beneficiary information to DOD and requests authorization to pay DOD's portion of the cost-share for the drugs to the network pharmacy. After receiving this information, DOD's Pharmacy Benefits Office checks beneficiary eligibility and potential drug interactions. DOD then authorizes the PBM to approve the transaction, accept the beneficiary's co-pay, and pay the pharmacy the difference between the beneficiary's co-pay and the retail price of the drugs. Most of this information exchange between the network pharmacy and the PBM occurs in 'real time' before the beneficiary's prescription is filled. However, DOD's payment to the pharmacy only occurs after a ten-day hold period.

*Coalition for Common Sense in Gov't Procurement v. Sec'y of Veterans Affairs*, 464 F.3d 1306, 1309-1310 (Fed. Cir. 2006).

56.    The 2008 Tricare Reimbursement Manual states:

TRICARE reimburses the allowable cost for covered pharmaceuticals and supplies less the applicable beneficiary deductibles and cost-shares and payments made by Other Health Insurance (OHI). . . . The TRICARE allowable cost will be **the lesser of the usual and customary price** or the maximum allowable cost (MAC) or [the] contractor's contracted rate for ingredient cost**.**

Tricare Reimbursement Manual (2008), 6010.58-M, at Ch. 1 §15.3.2.1 (emphasis added). Albertsons' billing practices that inflated pharmacy bills above the pharmacy's usual and customary charge defrauded Tricare when the usual and customary charge was lower than the alternative charges in the Tricare reimbursement formula.

57.    Albertsons' submission of an inflated claim for reimbursement to the administrator of the Tricare program, Express Scripts, was the equivalent of submitting the claim to the United States, since Express Scripts acts as the agent for the United States in reimbursing Tricare claims with federal funds. In addition, when Albersons

submitted an inflated claim to Express Scripts, acting in its capacity as administrator of the Tricare program, Albertsons caused Express Scripts to submit the claim to the United States (DOD) for payment.

58.    Albertsons has sold hundreds of thousands of prescriptions for the medications at issue here to the federal government through the above named healthcare programs, including veterans, the military, federal employees and Native Americans.    Albertsons has also caused hundreds of thousands of generic drug prescriptions to be sold through these same healthcare services that were paid for by the federal government, with the full knowledge of Albertsons.  Albertsons has made or caused these sales knowing that it is charging higher than its usual and customary prices as set by its cash customer discount program for generic drugs.  The above named programs will hereinafter be referred to as "government benefit programs."

## VII.    DRUG DISCOUNT PROGRAMS & ALBERTSONS'S FRAUDULENT ACTIONS

59.    In 2006, Wal-Mart began a discount program for cash customers who purchased prescription generic drugs. They priced these generic drugs at a flat $4 for thirty doses, and $9 for ninety doses. This became Wal-Mart's "Usual and Customary" (U&C) price for those medicines. Wal-Mart correctly established its billing system so that these discounted prices were transmitted as the Usual & Customary charge to Medicaid, Medicare and other government benefit programs.

60.    Albertsons saw the popularity of Wal-Mart's program for cash customers, and reacted to meet the competition with its own cash customer discount program for generics, marketing it initially as the "RxTra" program.  Albertsons discontinued the RxTra program sometime between August and October, 2013 and began their current

MyRxCare savings program.  Prior to MYRX Albersons was price matching Walmart on the majority of claims and cash payments where the co-pay was more than Walmart's generic prices on multiple source generics. This included claims that were billed to private sector plans. Where the co-pay was higher than the Walmart price match, most of the time the claim was cashed out and price adjusted at the out-window.

61.    The MyRxCare program is marketed and managed by Medical Security Card Company, LLC (MSC, d/b/a ScriptSave), 4911 Broadway Boulevard, Tucson, AZ 85711. The program's design is knowingly and fraudulently intended to circumvent the "usual and customary" pricing laws of the plaintiff governments.

62.    The MyRxCare program is marketed as a comprehensive pharmacy discount savings program that allows members to receive discounts on brand, generic, OTC and pet prescriptions. Some of its features are as follows:

- $3.99/$9.99 (up to 30 day supply/up to 90 day supply) on over 500 generic medications;   Although not listed in its advertising of the program, Albertsons prices a 60 day supply of their 500 generic medications at $6.99;

- Discount on all other prescriptions not included on the $3.99/$9.99 list;

- Discount on all immunizations ($24.99 flu shot vs. $29.99 current price);

- Upon pickup of first prescription member will be rewarded with a valuable coupon savings book to be used within the store;

- Membership/Enrollment is required;

  $11.99 annual fee.   Customers in Albertson's stores in California, Washington, and Utah, are exempt from the $11.99 enrollment fee

- All members of the household, including pets, are covered;

26

- Customers can enroll online or via brochure at the pharmacy or enrollment table;

- Prescriptions and services paid for in whole or in part by publicly funded health care programs, such as Medicare and Medicaid, are ineligible;

- Prescriptions and services covered in whole or in part by any private or publicly-funded health care program will be processed through that insurance plan unless specifically requested to process through the program; and

- Prescriptions processed using myRxCare will not count towards a customer's insurance deductible and cannot be used to discount a customer's co-pay.

See Exhibits 8, 9 and 10 which set out myRxCare program features and program drug listing.

63.     Albertsons knowingly crafted its myRxCare generic prescriptions cash discount program in a transparent attempt to wrongfully to deprive the federal and state governments' of the discounted prices by using an enrollment and fee requirement. Other myRxCare program parameters were designed to attempt denial of usual and customary benefits to Medicare, Medicaid and other government payer program customers.

64.     Among its features the program requires an applicant to sign up and fill out an application and to pay a $11.99 family fee. This fee is greatly offset by the substantial discounts offered in the plan.    In some cases the purchase of one prescription may save the customer 10 times the cost of the plan.

65.     Albertsons pharmacists and pharmacy technicians were trained and encouraged to sign up everyone on the myRxCare discount program except government payer customers, whether they had private insurance or not. By doing so Albertsons established their Usual & Customary as the myRxCare discount price, because **nearly all prescriptions not paid for by private insurance or Medicare or Medicaid were being processed under the myRxCare program.** Relator saw that if anyone was subject to a cash price, they were signed up on the MyRxCare program and received that price, thus establishing that the MyRxCare price is Albertsons's U&C price.

66.     Albertsons also misrepresents the position of the federal government, when it claims: **"Note:** Prescriptions and services paid for in whole or in part by publicly funded health care programs, such as Medicare and Medicaid, are ineligible." The government says the opposite in a consumer internet Medicare bulletin put out by the Department of Health and Human Services (HHS) on November 28, 2006. In this bulletin the department explains how to use Drug Discount Cards in conjunction with Medicare. See Exhibit 11. This bulletin came out about one year after Medicare Part D began and years before Albertsons started to market their MyRxCare program.

67.     State Medicaid agencies are generally unaware of this fraudulent overbilling scheme related to the "Usual and Customary" price on generic drugs. Their computerized billing systems and oversight programs are not designed to ferret out this U and C discrepancy fraud.

68.     Attached as Exhibit 9 is the current internet offering of Albertsons on its MyRxCare discount program.

## VIII.   RELATOR'S KNOWLEDGE OF THE FRAUD

69.    Relator started her employment with Albertsons on January 7, 2013 and worked for them as a pharmacist until she left that employment in June, 2015.

70.    Relator witnessed the introduction of the MyRxCare in 2013, and was instructed by  documents and program rules that it was against federal and state statutes to sign up any person receiving Medicaid, Medicare or any government payer plan, on the MyRxCare program.

71.    Relator has personal experience, involving the Albertsons pharmacy computer system called ARx which, on information and belief, is used by all Albertsons pharmacies nationwide.  This system has been programmed so that the pharmacists or technicians at the individual pharmacy level cannot modify the amounts that the government programs are billed.  Relator has personally viewed government plan customers being charged more than Albertsons's MyRxCare price.

72.    Relator's personal experience confirms that virtually no customer in an Albertsons pharmacy pays the cash price.  Either people are on private insurance or government plans like Medicare or Medicaid or they are put on the myRxCare program. Albertsons trains and urges all pharmacy employees to sign up every customer who is not on a government program, onto the myRxCare discount program.  This activity clearly establishes that the usual and customary price (U&C) is the myRxCare price.

73.    Relator observed that Albertsons pharmacists and technicians are powerless to rectify the situation by providing beneficiaries of the government payer programs with the lower myRxCare discounted prices for the generic drugs. Albertsons has set up its computerized billing system so that the Albertsons pharmacists and technicians at the retail level can do nothing about this overbilling, even if they are

29

aware of it. Albertsons pharmacists and technicians are prohibited from overriding price, and/or changing prices to give government payer programs the MyRxCare discount pricing. Relator alerted Albertsons to this fraud with emails to corporate compliance officers, phone calls to the compliance hotline, and interviews at the corporate headquarters. When relator complained to Albertsons management that myRxCare was overbilling the government she was chastised, accused of withholding information and non-cooperation, reprimanded and bullied by Daniel Day, Albertsons' Chief Compliance Officer and ordered to make her complaints through a non-functioning hotline. Albertsons then closed the lines of communication required by 42 CFR 422.503(b)(4)(vi)(D) in a certified letter to the relator from the VP of Compliance.

## IX.    PARTICULARITY OF ALBERTSONS ILLEGAL OVERBILLING

**Medicaid Overbilling Samples**

74.    This overcharging and failure to provide discount pricing to Medicaid is robust and pervasive.  In a very short period of time relator randomly examined 16 Albertsons' prescription records that were billed to Idaho Medicaid or contractor pharmacy benefit managers (PBM) adjudicating claims for Idaho Medicaid and discovered that 15 of the 16 prescriptions were billed and paid at higher rates than the discounted myRxCare program prices.

75.    Exhibit 11 (1 page) is a summary spreadsheet of these prescriptions showing the prescription number assigned by the Albertsons ARx pharmacy computer system, the date filled, doctor's name, plan identifier, name of drug, quantity, the amount paid by Medicaid, myRxCare price and overcharge amount.

76.    Exhibit 11 clearly shows that for just 15 prescriptions the government was charged $123.37 ($7.71 per prescription) more than if these patients were allowed to

participate in the myRxCare program.   These prescription records were randomly selected out of just 12 days of business in January, February and July of 2015 at several Albertsons pharmacies in the state of Idaho and represent only a fraction of all of the prescriptions filled for Idaho Medicaid on those days.

**Medicare Part D Overbilling**

77.    Just like the overbilling to Medicaid, this overcharging and failure to provide discount pricing to Medicare is just as robust and pervasive.   In a very short period of time relator randomly examined 31 prescription records that were billed to various Medicare Part D plans, or contractor pharmacy benefit managers (PBM) adjudicating claims for Medicare Part D plans, and discovered that all 31 prescriptions were billed and paid at higher rates than the discounted myRxCare program prices.

78.    Exhibit 12, (2 pages) is a  summary spreadsheet of these prescriptions, showing the prescription number assigned by the Albertsons ARx pharmacy computer system, the date filled and billed, patient's initials, doctor's name, Part D Plan, drug name, quantity, amount paid by Medicare Part D, the myRxCare price, and the overcharge amount.

79.    Exhibit 12 clearly shows that for just 31 prescriptions the government was charged $83.98 ($2.70 per prescription) more than if these patients were allowed to participate in the myRxCare program.   These prescription records were randomly selected over just 15 days of business in December 2014 and July 2015 at several Albertsons pharmacies in Idaho and represent only a fraction of all of the prescriptions filled by Albertsons in Idaho for Medicare Part D on those days.

**Tricare Overbilling**

80.     Just like the overbilling to Medicaid and Medicare, Albertsons has overbilled Tricare. At store 165 in Mountain Home, Idaho relator served many Air Force Tricare patients regularly, where she saw overbilling to Tricare on multiple source generics. The lower U&C price of the myRxCare program was not given to Tricare customers.  In fact, relator was working at this store regularly at the time when myRXCare rolled out and she saw the discrepancies from U & C costs frequently. Relator also observed overbilling of flu shots and Zostavax where the government overpaid a $20.00 and $35.00 administration fee, respectively.

81.     Exhibit 13 is a  spreadsheet of actual overbilled Tricare prescription records,  randomly selected,  showing the date filled and billed, doctor's name, Tricare plan, drug name, quantity, amount paid by Tricare and the overcharge amount.

82.     These prescription records were randomly selected over just 15 days of business in July 2014 at several Albertsons pharmacies in Idaho and represent only a fraction of all of the prescriptions filled by Albertsons in Idaho for Tricare on those days. All of these prescriptions were billed and paid at higher rates than the discounted myRxCare program prices, the true U&C prices.

## COUNT I

**Violations of the Federal False Claims Act**
**Medicaid, Tricare and Other Federal Programs**

83.     Relator-Plaintiff incorporates by reference and re-alleges all above paragraphs as if fully set forth herein.

84.     This Count is brought by Relator-Plaintiff in the name of the United States against Albertsons under the *qui tam* provisions of 31 U.S.C. §3729 et seq. Albertsons

violated 31 U.S.C. §3729(a)(I)(A) and the prior version of this clause, by knowingly presenting false claims to the United States, in respect to the portions of Medicaid, Tricare, CHAMPVA, FEHBP, United States Military Healthcare Facilities, the Indian Health Service Facilities and to public health clinics claims paid by the federal government. Albertsons also violated 31 U.S.C. §3729(a)(1)(B) and the prior version of this clause, by knowingly making, using or causing to be made or used, false records or statements material to a false or fraudulent claim, in the form of electronic submissions to the Medicaid, Tricare, CHAMPVA, FEHBP, United States Military Healthcare Facilities, the Indian Health Service Facilities and to public health clinics programs that represented prices for prescription drugs that were not truly the less expensive usual and customary prices.

85.   The United States, unaware of the falsity of the records, statements and claims made or caused to be made by Albertsons paid and continues to pay Medicaid, Tricare and the said other government program claims that would not be paid but for Albertsons unlawful conduct.

86.   As a result, plaintiff United States has paid and continues to pay the defendant Albertsons, since 2013, millions of dollars in illegal overpayments under the Medicaid, Tricare and other said government programs.

## COUNT II

## Violations of the Federal False Claims Act
## Medicare Part D and MA-PD Programs

87.   Relator incorporates by reference and re-alleges all above paragraphs as if fully set forth herein.

88.     Albertsons has systematically overbilled the Medicare Part D and MA-PD system since 2013. The foundation of this illegal overbilling was and is the knowing refusal to charge the lower usual and customary price for hundreds of generic and name brand drugs at their retail pharmacy outlets.  Its illegal overbillings also cause higher risk-sharing and reconciliation payments for its Sponsor corporations that are based upon the inflated U&C billings.  Also, Albertsons through its retail outlets knowingly ignored the requirement to provide the U&C lower prices required by the clear contract terms of PBMs and sponsors.  The false or fraudulent claims and statements were and continue to be material to the United States paying higher than the legal usual and customary price for the prescription drugs on the Medicare programs, as the claims would not be paid but for Albertsons' unlawful conduct.

89.     Since 2013, by its conduct described above in the Medicare Part D and MA-PD systems, Albertsons knowingly presented or caused to be presented false and/or fraudulent claims in violation of the Federal Civil False Claims Act, 31 U.S.C. §3729 (a)(1)(A) and the prior version of that statutory clause. It also knowingly misled the federal government, by its billings, contracts language and other representations in regard to the benefit of U&C pricing, when Albertsons knew it was not providing that benefit on millions of claims.

90.     Also in the Medicare Part D and MA-PD systems, since 2013, Albertsons and their subsidiaries, and/or their agents, predecessors, successors, and employees knowingly made or used and caused to be made and used false records or statements in violation of the False Claims Act, 31 U.S.C. §3729(a)(1)(B) and the prior version of that statutory clause.  These records and statements were and

34

are material to the federal government making wrongfully excessive payment for the prescription drugs at issue under the Medicare Part D and MA-PD systems.

91.     The false records or statements knowingly made, used or caused to be made or used by Albertsons in the Medicare Part D billings, in violation of §3729(a)(1)(B), include but are not limited to electronic transmissions of billing statements made by Albertsons for the identified prescription drugs.   All of these billings were and continue to be claims that are subject to the $5,500 to $11,000 per claim penalty under the False Claims Act.

92.     Further records or statements violating §3729(a)(1)(B) made by Albertsons include, but are not limited to: the contracts it entered as retail outlets, in the Medicare Part D and MA-PD systems, whether between its own subsidiaries or between one of its subsidiaries and other companies' retail outlets.

93.     As a direct result, federal Medicare Part D and MA-PD systems have been caused and continue to overpay Albertsons on at least:

a.     false or fraudulent claims related to Part D and MA-PD prescription drugs that would not have been paid but for Albertsons knowingly illegal, improper, and reckless business practices;

b.     increased subsidies to Medicare Part D and MA-PD Plan Sponsors, including but not limited to Medicare Part D Plan sponsors, through: direct advance monthly payments; reinsurance subsidies; low-income cost-sharing subsidies (or grants for low-income Part D individuals received in lieu of low-income subsidies); risk-sharing arrangements; year-end retroactive adjustments and reconciliations: and/or reinsurance payments made for private fee-for-service plans; and

c.     contracts with Albertsons as providers of Part D and MA-PD services, whether as a downstream entity, including but not limited to CMS's Electronic Data Interchange ("EDI") Agreement, and/or other agreements which are necessary for Part D providers to submit claims or data to CMS and/or to receive payments related to the Medicare Part D program.

94.     Albertsons utilizes an automated nationwide claims adjudication system in all States where Albertsons provides prescription services, and, as a result, Albertsons' illegal and improper practices have caused the federal government to pay false or fraudulent claims throughout the United States under the Medicare Part D and MA-PD systems.

95.     As a direct and foreseeable result of Albertsons above described illegal practices, the federal Medicare Part D and MA-PD systems have overpaid Albertsons multiple millions of dollars, and continue to wrongfully overpay Albertsons.  This is the ultimate effect of Albertsons retail overpricing, even though the excessive billings get passed through Sponsors and PBMs of the Medicare Part D and MA-PD systems.

**COUNT III**

**California False Claims Act**
**Cal. Government Code §§12650-12655**

96.     Relator incorporates by reference and re-alleges all above paragraphs as if fully set forth herein.

97.     This is a claim against Albertsons for treble damages and penalties on behalf of the State of California under the California False Claims Act, California Government Code §§12650-12655.

98.     By virtue of the above-described acts, Albertsons did knowingly overcharge the California Medicaid program for prescription drugs, in violation of California Code 12651(a)(1) and (2). Albertsons knowingly caused false claims to be presented to the California Medicaid program, known as Medi-Cal, by illegally charging higher than its usual and customary prices. Albertsons also knowingly made, used or caused to be made or used false records or statements material to a false or fraudulent

claim, in the form of electronic submissions to the Medi-Cal program that represented prices for the prescription drugs that were not truly the less expensive usual and customary prices.

## COUNT IV

**Colorado Medical False Claims Act**
**Violation of Colorado Revised Statutes 25.5-4-303.5 to 25.5-4.309**

99.    Relator incorporates by reference and re-alleges all above paragraphs as if fully set forth herein.

100.    This is a claim against Albertsons for treble damages and penalties on behalf of the State of Colorado under the Colorado False Claims Act, Violation of Colorado Revised Statutes 25.5-4-303.5 to 25.5-4.309.

101.    By virtue of the above-described acts, among others, Albertsons did knowingly overcharge the Colorado Medicaid program for prescription drugs, in violation of Colorado Revised Statutes 25.5-4-303.5 to 25.5-4.309. Albertsons violated Colorado Revised Statutes 25.5-4-305(1) (a) by knowingly causing false claims to be presented to the Colorado Medicaid program, by illegally charging higher than its usual and customary prices. Albertsons also violated Colorado Revised Statutes 25.5-4-305(1)(b) by knowingly making, using or causing to be made or used false records or statements material to a false or fraudulent claim, in the form of electronic submissions to the Medicaid program that represented prices for the prescription drugs that were not truly the less expensive usual and customary prices.

## COUNT V

**Florida False Claims Act**
**Fl. Stat. §68.081-68.090**

102.   Relator incorporates by reference and re-alleges all above paragraphs as if fully set forth herein.

103.   This is a claim against Albertsons for treble damages and penalties on behalf of the State of Florida under the Florida False Claims Act, violation of Fl. Stat. §68.081-68.090.

104.   By virtue of the above-described acts, among others, Albertsons did knowingly overcharge the Florida Medicaid program for prescription drugs, in violation of Fl. Stat. §68.081-68.090. Albertsons knowingly caused false claims to be presented to the Florida Medicaid program, by illegally charging higher than its usual and customary prices in violation of Fl. Stat. §68.082(2)(a). Albertsons also knowingly made, used or caused to be made or used false records or statements material to a false or fraudulent claim, in the form of electronic submissions to the Medicaid program that represented prices for the prescription drugs that were not truly the less expensive usual and customary prices, in violation of Fl. Stat.§68.082(2)(b).

## COUNT VI

**Louisiana Medical Assistance Programs Integrity Law**
**Louisiana Rev. Stat. 46 §437 *et seq.***

105.   Relator incorporates by reference and re-alleges all above paragraphs as if fully set forth herein.

106.   This is a claim against Albertsons for treble damages and penalties on behalf of the State of Louisiana under the Louisiana Rev. Stat. 46 §437 et seq.

107.   By virtue of the above-described acts, among others, Albertsons did knowingly overcharge the Louisiana Medicaid program for prescription drugs, in violation of Louisiana Rev. Stat. 46 §437 et seq.  Albertsons knowingly caused false claims to be presented to the Louisiana Medicaid program, by illegally charging higher than its usual and customary prices in violation of Louisiana Rev. Stat. 46 §438.3(A). Albertsons also knowingly made, used or caused to be made or used false records or statements material to a false or fraudulent claim, in the form of electronic submissions to the Medicaid program that represented prices for the prescription drugs that were not truly the less expensive usual and customary prices, in violation of  Louisiana Rev. Stat. 46 §438.3(B).  .

**COUNT VII**

**Violation of the Montana False Claims Act**
**MONT. CODE ANN. § 17-8-401 — 17-8-416**

108.   Relator incorporates by reference and re-alleges all above paragraphs as if fully set forth herein.

109.   This is a claim against Albertsons for treble damages and penalties on behalf of the State of Montana under the Montana False Claims Act, Mont. Code Ann. §17-8-401 - 17.8-416.

110.   By virtue of the above-described acts, among others, Albertsons did knowingly overcharge the Montana Medicaid program for prescription drugs, in violation of Mont. Code Ann. §17-8-401 - 17.8-416.  Albertsons knowingly caused false claims to be presented to the Montana Medicaid program, by illegally charging higher than its usual and customary prices in violation of Mont. Code Ann. §17-8-403(1)(a). Albertsons also knowingly made, used or caused to be made or used false records or statements

material to a false or fraudulent claim, in the form of electronic submissions to the Medicaid program that represented prices for the prescription drugs that were not truly the less expensive usual and customary prices, in violation of Mont. Code Ann. §17-8-403(1)(b).

**COUNT VIII**

**Nevada False Claims Act**
**NEV. REV. STAT. ANN. §357.010-.250**

111.    Relator incorporates by reference and re-alleges all above paragraphs as if fully set forth herein.

112.    This is a claim against Albertsons for treble damages and penalties on behalf of the State of Nevada under the Nevada False Claims Act, violation of Nevada Rev. Stat. Ann. §357.01-.250.

113.    By virtue of the above-described acts, among others, Albertsons did knowingly overcharge the Nevada Medicaid program for prescription drugs, in violation of Nevada Rev. Stat. Ann. §357.01-.250. Albertsons knowingly caused false claims to be presented to the Nevada Medicaid program, by illegally charging higher than its usual and customary prices in violation of NRS §357.040 1.(a). Albertsons also knowingly made, used or caused to be made or used false records or statements material to a false or fraudulent claim, in the form of electronic submissions to the Medicaid program that represented prices for the prescription drugs that were not truly the less expensive usual and customary prices, in violation of NRS §357.040 1(b).

## COUNT IX

**New Mexico Medicaid False Claims Act**
**N.M. STAT. ANN. §27-14-1- 27-14-15**

114.   Relator incorporates by reference and re-alleges all above paragraphs as if fully set forth herein.

115.   This is a claim against Albertsons for treble damages and penalties on behalf of the State of New Mexico under the New Mexico False Claims Act, N.M. Stat. Ann. §27-14-1 - 27-14-15.

116.   By virtue of the above-described acts, among others, Albertsons did knowingly overcharge the New Mexico Medicaid program for prescription drugs, in violation of N.M. Stat. Ann. §27-14-1 - 27-14-15.  Albertsons knowingly caused false claims to be presented to the New Mexico Medicaid program, by illegally charging higher than its usual and customary prices in violation of NM Stat. §27-14-4(A). Albertsons also knowingly made, used or caused to be made or used false records or statements material to a false or fraudulent claim, in the form of electronic submissions to the Medicaid program that represented prices for the prescription drugs that were not truly the less expensive usual and customary prices, in violation of NM Stat. §27-14-4(C).

## COUNT X
**Washington State Medicaid Fraud False Claims Act**
**RCW §74.66.005-74.66.130**

120.   Relator incorporates by reference and re-alleges all above paragraphs as if fully set forth herein.

121.   This is a claim against Albertsons for treble damages and penalties on behalf of the State of Washington under the Washington State Medicaid Fraud False Claims Act, RCW §74.66.005-74.66.130.

122.   By virtue of the above-described acts, among others, Albertsons did knowingly overcharge the Washington Medicaid program for prescription drugs, in violation of Washington RCW §74.66.005-74.66.130.   Albertsons knowingly caused false claims to be presented to the Washington Medicaid program, by illegally charging higher than its usual and customary prices in violation of RCW §74.66.020(1)(a). Albertsons also knowingly made, used or caused to be made or used false records or statements material to a false or fraudulent claim, in the form of electronic submissions to the Medicaid program that represented prices for the prescription drugs that were not truly the less expensive usual and customary prices, in violation of RCW §74.66.020(1)(b).

## X.   PRAYER FOR RELIEF

123.   Pursuant to the federal False Claims Act, the United States and Relator request treble damages, a penalty of $5,500 to $11,000 per claim, and all attorneys' fees and costs allowed under the Act against Albertsons.

124.   Pursuant to the false claim acts of the states, the states and Relator request treble damages, all per-claim penalties, and attorneys' fees and costs against Albertsons.

124.   Relator requests an appropriate share of the recoveries for the United States and all of the plaintiff states pursuant to their respective false claims acts.

## XI.   JURY DEMAND

Plaintiffs demand trial by jury on all claims.

O'CONNELL & SOIFER LLP


_____

Patrick O'Connell
O'Connell & Soifer LLP
Attorney for Plaintiffs/Relators
98 San Jacinto Blvd., Suite 540
Austin, TX  78701
(512) 852-5918
poconnell@oconnellsoifer.com


**WOJTALEWICZ LAW FIRM, LTD.**
    Brian Wojtalewicz
    Attorney for Plaintiffs/Relator
    MN Lic. #118369
    139 N. Miles, P.O. Box 123
    Appleton, MN  56208-0123
    (320)289-2363
    brian@wojtalewiczlawfirm.com

**ROBERT P. CHRISTENSEN, P.A.**
    Robert P. Christensen
    Attorney for Plaintiffs/Relator
    MN. Lic. #16597
    5775 Wayzata Boulevard, Suite 670
    St. Louis Park, MN 55416
    (612)333-7733
    bob@mnadvocatesforjustice.com

**NEIL P. THOMPSON, RPH, ESQ.**
    Neil P. Thompson
    Attorney for Plaintiffs/Relator
    MN. Lic. #0291638
    2249 East 38th Street
    Minneapolis, MN 55407-3083
    (612)246-4788
    nptrxlaw@gmail.com

**LEVANDER & VANDER LINDEN, P.A.**
    James G. Vander Linden
    Attorney for Plaintiffs/Relator
    MN. Lic. #112136
    5775 Wayzata Boulevard, Suite 670
    St. Louis Park, MN 55416
    (612)339-6841
    jim@vanderlindenlaw.com